IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHERYL L. REAVES,                    )
                                     )    No. CV 06-1197-HU
            Plaintiff,               )
                                     )
      v.                             )
                                     )    FINDINGS AND RECOMMENDATION
MICHAEL J. ASTRUE,                   )
Commissioner, Social                 )
Security Administration,             )
                                     )
            Defendant.               )
_____    )

Sara L. Gabin
Five Centerpointe Drive, Suite 400
Lake Oswego, Oregon
97035
      Attorney for plaintiff

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
Franco L. Becia
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
      Attorneys for defendant


FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Cheryl Reaves brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits and Supplemental Security Income benefits.

## Procedural Background

Ms. Reaves filed for benefits on April 3, 2003. She alleges disability on the basis of post-concussive syndrome, depressive disorder and left ear tinnitus. She alleges that she became unable to work on August 11, 2002. Her date last insured for purposes of disability benefits was December 31, 2005.

Ms. Reaves's applications were denied initially and on reconsideration. A hearing was held on November 17, 2005, before Administrative Law Judge (ALJ) Thomas Tielens. On January 18, 2006, the ALJ issued a decision finding Ms. Reaves not disabled. On July 10, 2006, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Ms. Reaves was born December 14, 1961, and has a 10th grade education. Her past work is as a fast food server, gas station attendant and custom carpenter.

## Medical Evidence

Ms. Reaves was injured in an automobile accident on August 11, 2002, sustaining a closed head injury with cerebral contusion and minimally depressed skull fracture; complex multiple facial

FINDINGS AND RECOMMENDATION Page 2

fractures; optic nerve contusion; right submandibular hematoma. Tr. 184, 222, 231, 236. She was discharged in good condition after 20 days in the hospital. Tr. 185.

On October 18, 2002, Ms. Reaves was seen by Daniel Wayman, M.D., an ear nose and throat surgeon, for complaints of loss of the sense of smell and taste and diminished hearing of the left ear. Tr. 242. Ms. Reaves reported that she had some induced imbalance and occasional true vertigo with rapid head motion. Id.

In Dr. Wayman's opinion, Ms. Reaves's altered sense of smell was the result of sheared olfactory nerves, and her hearing loss and vertigo were the result of the temporal bone fracture. Id.

On January 14, 2003, she had surgery to repair a temporal bone fracture of the left ear that had caused conductive hearing loss. Tr. 236-37. She tolerated the procedure well and there were no complications. Tr. 237. On June 24, 2003, an audiologic evaluation showed improvement in the hearing of the left ear by 10 decibels. Tr. 259. Ms. Reaves said she was still bothered by ongoing tinnitus in the left ear; Dr. Wayman noted that he had reassured her and discussed camouflage. Id.

On March 18, 2003, she was referred by her treating physician, Michael Robinson, D.O., to a neurologist, Walter Carlini, M.D., Ph.D. Tr. 247. Dr. Carlini recorded that Ms. Reaves had complaints of headaches, memory loss and tinnitus. Id. Ms. Reaves told Dr. Carlini that ever since her accident, she had been afflicted with tinnitus of the left ear, described as "screaming sounds," a chronic daily headache, and short term memory loss. Id. The

FINDINGS AND RECOMMENDATION Page 3

headaches were present biooccipitally and then forward to the retro-orbital region. Id. The headaches were not associated with nausea, vomiting, photophobia or visual aura. Id.

Ms. Reaves reported that she had also experienced short term memory loss and emotional lability, increased irritability, crying spells, and depressive symptoms including poor sleep, poor appetite and anhedonia. She said she was under considerable stress due to a number of factors including charges of criminal contempt for failing to pay child support.

Dr. Carlini's diagnostic impression was "persistent changes of traumatic brain injury (a case of major post concussion syndrome);" severe depression, anxiety disorder; and severe situational stressors. Tr. 249. Dr. Carlini recommended a referral to a psychiatrist for more intensive management of her "fairly significant depression and anxiety disorder," and also recommended that she be referred for formal neuropsychiatric evaluation. Id. Dr. Carlini also proposed switching Ms. Reaves from Effexor to a tricyclic antidepressant, which he considered generally better in treating the headaches associated with post concussion syndrome. Id.

On June 5, 2003, Ms. Reaves was seen by Edwin Pearson, Ph.D., a psychologist, on behalf of the agency. Dr. Pearson administered the Wechsler Adult Intelligence Scale (WAIS-III), Wechsler Memory Scale (WMS-III), Trailmaking Test, and the Reitan-Indiana Aphasia Screening Test. Tr. 250. A one hour diagnostic interview was also conducted. Id.

FINDINGS AND RECOMMENDATION Page 4

Ms. Reaves told Dr. Pearson her last job was in a cabinet shop where she did some assembly work off and on for about three and a half years, depending upon the workload. Tr. 251. There was a slowdown in 2001, at which time she was laid off, and she had not worked since that time. Id. Before being employed in the cabinet shop, Ms. Reaves had worked in gas stations for 10 to 12 months at a time and worked at a Taco Bell for four to six months.

Ms. Reaves reported being convicted of methamphetamine possession and/or sales in 1996 and a 2000 conviction of a felony drug possession charge, "although she could not name the charge specifically." Id. In 2001, Ms. Reaves was convicted of failure to pay child support. Id.

Dr. Pearson wrote that since the car accident, she had been complaining of tinnitus in the left ear, a constant high-pitched sound "like a scream." Id. She also complained of daily headaches, not constant, but "come and go." Id. She described herself as emotionally labile and subject to depression. Tr. 252. She was taking hydrocodone for the headaches, hypertension medication, a diuretic, and Effexor for depression. Id. Later in the interview, Ms. Reaves stated that she was also taking trazodone for sleeping problems. Tr. 253.

Ms. Reaves recounted a history of drug problems. Tr. 252. She started using marijuana in high school and had continued to smoke marijuana throughout her adult life, currently using marijuana for relief from headaches. Id. She said she had used methamphetamine off and on over the course of her adult life, and that she was in

court mandated treatment for substance abuse in 1996 and 2000. <u>Id.</u>

Ms. Reaves stated that for the past three years, off and on, she had been living with a 48 year old disabled woman and her husband. She did not like the arrangement, but claimed to have nowhere else to go because she had no friends or family support. <u>Id.</u>

Dr. Pearson's observations of Ms. Reaves were that she was completely oriented and cooperative, but there was extreme emotional lability, including numerous crying episodes, loud, excited expressions of pain and dissatisfaction with her life, and agitation. Tr. 253. Although Ms. Reaves had complained of constant ringing in her ears, once the testing started, there was "not a single complaint of ringing in her ears for two or more hours." <u>Id.</u> In Dr. Pearson's opinion, there was "a dramatic quality to this individual's expressions of pain and suffering throughout the interview, yet completely absent during testing." <u>Id.</u>

Psychological testing indicated that Ms. Reaves was "operating across the borderline to low average range," with a full scale IQ of 81. She did not exhibit significant problems on tasks requiring sustained attention and concentration. Tr. 254.

On the Wechsler Memory Scale, she displayed significant discrepancy between abilities on tests of auditory versus visual memory. Her scores from auditory memory in immediate and delayed testing were significantly below what one would expect of an individual who was assumed to be of low average intelligence. <u>Id.</u> Her scores on visual memory tests were consistently in the low

FINDINGS AND RECOMMENDATION Page 6

average range. _Id._ Her scores on the trailmaking test fell within an acceptable range given her assumed level of general intelligence. _Id_. There was no evidence of impaired attentional control on tasks requiring visual scanning and sequencing. _Id._

On the Reitan-Indiana Aphasia Screening Test, Ms. Reaves's scores were completely within normal limits. _Id._ In Dr. Pearson's opinion, the cognitive problems elicited on testing did not, "in and of themselves, suggest that she would be unable to function in the competitive job market." Tr. 255. He opined that she needed mental health counseling and close supervision of medications; further, he thought she needed to get back into a substance abuse program, because he did not "believe that medical use of marijuana in this case is appropriate for headache management." _Id._

Dr. Pearson's diagnostic impressions were adjustment disorder with mixed anxiety and depressed mood; cannabis abuse (rule out cannabis dependence); amphetamine abuse (rule out amphetamine dependence), allegedly in remission since August of 2002; personality disorder not otherwise specified (NOS) with histrionic, self-defeating, and dependent traits. _Id._

On July 29, 2003, Karen Bates-Smith, Ph.D., performed a records review and completed a mental residual functional capacity assessment. Dr. Bates-Smith's findings and opinions were affirmed by Frank Lahman, Ph.D. on February 10, 2004. Tr. 261. Dr. Bates-Smith agreed with the diagnoses of Dr. Pearson, finding that Ms. Reaves had an adjustment disorder with anxiety and depressed mood; a personality disorder with histrionic, self-defeating and

dependent features; and cannabis and methamphetamine abuse. Tr. 261-270. Dr. Bates-Smith thought Ms. Reaves was mildly limited in activities of daily living and moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace. Tr. 271. She did not think Ms. Reaves was significantly limited in her ability to remember short and simple instruction or in the ability to carry out short and simple instructions, but thought her moderately limited in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, accept instructions and respond appropriately to supervision, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. Tr. 276-78.

On July 29, 2003, Howard Johnson, M.D., a surgeon, performed a records review on behalf of the agency and completed a residual physical functional capacity assessment. Tr. 280-284. Dr. Johnson's opinions were affirmed by Sharon Eder, M.D., on February 10, 2004. Tr. 284. In Dr. Johnson's opinion, Ms. Reaves's only physical limitations were in the areas of hearing and balance, so that she was excluded from tasks requiring balancing and involving even moderate exposure to noise. Tr. 283.

Ms. Reaves's treating physician, Michael T. Robinson, D.O., provided routine care to Ms. Reaves, such as for ear pain, ear draining, sore throat, fever and cold, see tr. 303, 305, 307, 308, 309, 318, 320, 410. However, several of Dr. Robinson's chart notes

refer to complaints of depression, see tr. 310, 312, 316, 414, as well as headaches and memory loss. For example, a chart note dated May 12, 2003 notes that Ms. Reaves is "very emotional today and has been drinking." Tr. 314. Also noted on that date were increasing problems with memory loss, anxiety about an impending court hearing for failure to pay child support, inability to sleep, and problems with a relationship. Id.

Dr. Robinson, D.O. wrote letters on Ms. Reaves's behalf, stating his belief that she was disabled and unable to return to any kind of work on April 16, 2003, tr. 288 and on September 30, 2003, tr. 287.

On November 14, 2003, Dr. Robinson noted that there was "a possibility that she might be bipolar." Dr. Robinson started her on Zyprexa and advised her to go to Jackson County Mental Health for counseling. Tr. 416.

In November 2003, Ms. Reaves sought treatment at Jackson County Mental Health on a crisis basis. Tr. 397. Sharon Kellington, M.S.W., noted that Ms. Reaves was "crying, flight of ideas, hyperverbal, pressured, very labile, stream of consciousness monologue." Tr. 397. Ms. Reaves admitted using marijuana regularly since the car accident, and Ms. Kellington noted a "faint odor of [alcohol] in room." Ms. Reaves denied using methamphetamine. Id.

At that time Ms. Reaves said she had a constant "scream" in her head and that her ears were "continuously draining." Id. Ms. Reaes also reported depression "since about age 39-40," but "a million times worse" since the accident. Id.

FINDINGS AND RECOMMENDATION Page 9

On December 4, 2003, Ms. Kellington wrote that she discussed with Dr. Robinson "the fact that her presentation certainly mimicked a person who was high on methamphetamine and he agreed with that." Tr. 395. "I also observed that it also looked a lot like bipolar disorder and he agreed with that too." Id. Ms. Kellington subsequently noted that she had a later conversation with Ms. Reaves, and that she was "disorganized, difficult to understand." Id.

On January 7, 2004, Ms. Reaves was seen for a psychiatric evaluation at Jackson County Mental Health, upon a referral from Dr. Robinson. Tr. 391. Jackson Dempsey, M.D., recorded her history of head injury and substance abuse. Id. She reported that she was currently suffering from chronic headaches, tinnitus and impaired memory as a result of her head injury, as well as depression. Id. However, Ms. Reaves reported "beginning to be able to enjoy herself again" after the accident and "getting back into arts and crafts." Id. She reported smoking marijuana when possible, which made her "mellower, happy and does not dwell on negative things." Id.

Dr. Dempsey's diagnoses were mood disorder secondary to head injury incurred in motor vehicle accident; possible dementia; alcohol abuse in remission; amphetamine abuse in remission; and ongoing marijuana use. Tr. 392. Dr. Dempsey rated her current GAF at 45. Tr. 393.

Dr. Dempsey decided to add an antidepressant to the Zyprexa she was currently taking, and started her on Zoloft. Id.

Ms. Reaves saw Dr. Dempsey again on March 3, 2004. Tr. 389.

FINDINGS AND RECOMMENDATION Page 10

She reported that she found the Zoloft helpful in decreasing her depression amd moodiness. Id. She reported that when she ran out of Zoloft, the symptoms returned. Id. During the interview, Ms. Reaves was anxious, restless and agitated, tearful for much of the interview. Id. She reported that she was not that way when she was taking her medication. Id. Ms. Reaves was preoccupied with her current relationship and her unhappiness with it. Id. Dr. Dempsey encouraged Ms. Reaves to establish with a primary care provider when she moved to Salem so that she could continue on the medication.

On March 25, 2004, Ms. Reaves terminated treatment with Dr. Robinson because she was moving to Salem. Tr. 403. At that time, her medications were trazodone and vicodin. Tr. 404.

On April 13, 2004, Ms. Reaves was seen at Lancaster Urgency Care Clinic. Tr. 422. Her prescriptions for Vicodin and trazadone were refilled. Tr. 423.

On October 22, 2004, Ms. Reaves was seen at New Perspectives Center for mental health treatment. Tr. 429-38. On October 28, 2004, New Perspectives Center made a determination that Ms. Reaves should be referred to the Rehabilitation Unit at Salem Hospital for treatment of mood disorders due to head trauma and contacted Ms. Reaves. Tr. 427-28. On December 1, 2004, New Perspectives recorded that Ms. Reaves had not returned for services and closed her case. Id.

On November 30, 2004, Ms. Reaves had a physical therapy evaluation. Tr. 442. She complained of headaches, memory loss,

emotional instability, difficulties with sustained attention, and tinnitus in the left ear. Id. Ms. Reaves's presentation was "somewhat tearful and disorganized verbally, [but] moving well physically." Id. She initially complained of diziness with cervical extension, but these complaints were found to be variable and not reproducible on evaluation. Id. The evaluator wrote that Ms. Reaves presented with "minimal physical complaints," and that "objective findings are few." her balance was within normal or above average for all tests. Tr. 444. It was determined that no services other than mental health were needed. Tr. 443.

On October 18, 2004, Ms. Reaves sought treatment at Primary Care West with Elaine Harlan, FNP. Tr. 462. Ms. Reaves reported that the Urgent Care Center stopped her Zoloft, trazodone and Vicodin, and that she had been without medication for the last three months. Id. She complained of not sleeping well and being unable to take care of herself. Id. Ms. Harlan noted that Ms. Reaves was tearful at times and easily distracted, but in no acute distress. Id. She was re-started on Zoloft and trazodone. Id.

On November 18, 2004, Ms. Reaves reported to Ms. Harlan that she had been taking the Zoloft and trazodone, but continued to feel depressed and unable to sleep through the night. Tr. 461. She also reported memory problems. Id. Her Zoloft dosage was increased. Id.

Ms. Reaves was given a physical therapy evaluation at Salem Hospital on November 30, 2004. Tr. 442. Ms. Reaves complained of "constant screaming" in her left ear. Id. She presented "somewhat tearful and disorganized verbally," but "moving well physically."

FINDINGS AND RECOMMENDATION Page 12

_Id._ She initially complained of symptoms of dizziness with cervical extension, but these complaints were "variable and not reproducible on evaluation." _Id._

She demonstrated normal equilibrium and righting reactions. Tr. 444. Static standing tests were normal. _Id._ She demonstrated successful tandem gait and single limb support. _Id._ Motor strategies were fully present and effectively employed for ankle, hip and stepping responses in both lateral and anterior/posterior planes. _Id._ Dynamic gait skills were normal with no performance deviations following abrupt stops, rapid turns or gait in conjunction with head motion, although Ms. Reaves did complain of some dizziness with vertical head movement. _Id._ The physical therapist concluded that Ms. Reaves's physical complaints were "minimal," and that "objective findings were few." _Id._

On December 27, 2004, Ms. Harlan wrote that Ms. Reaves reported the Zoloft had been helpful and that she was sleeping better. Tr. 460. Ms. Harlan noted that she did seem "a little more relaxed today," but she continued to be "scattered in her thoughts" _Id._

On March 25, 2005, Ms. Reaves told Ms. Harlan that when she uses her medication she "usually is feeling better," and that she "sleeps better with the trazodone." Tr. 459.

On June 27, 2005, Ms. Reaves reported that her mood was "usually up," and that she was sleeping well and had a good appetite. _Id._ She complained of some headaches, but "nothing that is severe." _Id._ Ms. Harlan noted that she was calmer than ever

before, and not crying. Ms. Reaves reported that she was caring for her house and gardening with house plants. Id. She was continued on 100 mg. of Zoloft and trazodone, and advised to take Advil or Tylenol for the headaches. Id.

## Hearing Testimony

At the hearing held on November 17, 2005, Ms. Reaves testified that she occasionally volunteers at a thrift store on Saturdays to "get me out of the house," and "just so I get around people." Tr. 485-86. She does not read, but watches TV, though she cannot remember what she watched. Tr. 487. She stated that before the accident, she was able to take instructions and follow through. Tr. 488. She said she cries frequently, "without nothing that will set me off." Tr. 488. She said she has not used methamphetamine since before the car accident, tr. 489, and last used marijuana "about a week ago," for headaches. Tr. 490. She said that during the past year or two she got away from the people with whom she used to drink, and has reduced her alcohol consumption since then. Id. Ms. Reaves testified that she has a driver's license, but no insurance. Tr. 493. She owes $7,500 in child support arrears, and testified that her driver's license was at one time suspended for failure to pay child support. Tr. 494. Her license was reinstated in 2003, after she agreed to pay $10 a month in child support. Id.

Ms. Reaves testified that she has headaches located behind her right eye or at the base of her skull. Tr. 498. She rated the pain as a 7 on a scale of 10 and said she has them three or four times a week. Tr. 498. When she has the headaches, she smokes marijuana

FINDINGS AND RECOMMENDATION Page 14

and lies down. Id. She does not take prescription pain medication any more, but manages with Excedrin Migraine and marijuana. Tr. 499. Her other medications are trazodone and Zoloft. Tr. 500.

Ms. Reaves testified that the trazodone helps her sleep at night and the Zoloft makes her "not as depressed." Tr. 500. She currently gets a good night's sleep. Id. Indoor plants are a hobby with her, and she is learning more about outdoor plants. Tr. 501. She also does dishes, vacuums and dusts. Tr. 502. She also prepares meals. Id. Ms. Reaves testified that from the time she wakes up to the time she falls asleep, she has "screaming" in her ear. Tr. 503.

Lynda Kelly also gave testimony at the hearing. Ms. Kelly had known Ms. Reaves 27 years previously, returned to the area a year and a half ago, and renewed her acquaintance with Ms. Reaves approximately six to seven months before the hearing. Tr. 505-06. Ms. Kelly testified that over the last six months, Ms. Reaves has had to re-learn basic tasks such as using her sewing machine, giving her dog a bath, loading the dishwasher, and cleaning the bathroom, tr. 507-08, and that she doesn't cook. Id. Ms. Kelly described Ms. Reaves as having been, 30 years earlier, "very fun loving and energetic," while now she is "fearful, frustrated, and angry." Tr. 507.

Ms. Kelly testified that Ms. Reaves does a "lot of craft work," and uses a circular saw and a drill while "out in the garage yakking" with Ms. Kelly, tr. 510-11, but also testified that Ms. Reaves could not remember the correct way to pot a plant, putting the plant in before the dirt. Tr. 512. Ms. Kelly testified that "if

FINDINGS AND RECOMMENDATION Page 15

a day goes by and we redo it another day, we go through that again." Id. Ms. Kelly testified that Ms. Reaves has trouble watching television "because it's hard for her to concentrate ... on an hour long program." Tr. 513. However, Ms. Kelly testified that Ms. Reaves had "probably ... 300" plants and that she "spends time with the neighbors teaching the sheriff's wife how to do craft stuff." Tr. 514. Ms. Kelly testified that she has never seen Ms. Reaves finish any of the craft projects she starts. Tr. 515.

Ms. Reaves disputed Ms. Kelly's testimony, saying that she helps her neighbor with plants, but not with power tools or crafts. Tr. 518. However, Ms. Reaves did acknowledge that she makes wind chimes with a saw and drill. Tr. 520.

The ALJ called Vocational Expert (VE) Paul Morrison. Tr. 522. The ALJ asked the VE to consider a hypothetical person who was without exertional limitations, but restricted from using ropes, ladders, or scaffolds and from even moderate noise and hazards in the workplace; capable of simple, repetitive work with limited interaction with the public and co-workers. Tr. 523. Mr. Morrison opined that such a person could not return to Ms. Reaves's prior work, but could work as a sandwich maker (medium, unskilled), care giver (medium, semi-skilled) and electronic assembler (sedentary, semi-skilled). Tr. 524. Mr. Morrison did not think Ms. Reaves could do work involving plants, horticulture or yard care because of her limitation to simple, repetitive tasks. Id.

The ALJ then added the additional limitation of not being "able to stay on task," "drifting away from the work that needs to

be done." Tr. 525. The VE responded that such a person would be unable to maintain competitive employment. Id. Upon questioning by Ms. Reaves's lawyer, the VE testified that an employee who couldn't "remember from shift to shift how to do what needs to be done," would also not be able to maintain employment. Tr. 526.

### ALJ's Decision

_____The ALJ found that Ms. Reaves's complaints of depression had alleviated as of her November 2003 report that since beginning counseling and taking Zoloft and Zyprexa, she was calmer and beginning to enjoy herself again, her mood was elevated, she was sleeping well, and she had a good appetite. She reported some headaches, but nothing severe. Tr. 26.

The ALJ rejected Ms. Reaves's allegations of dizziness and poor balance based on the November 2004 physical therapy evaluation which was normal for all tests. Tr. 26. He concluded that Ms. Reaves's alleged dizziness and poor balance were not severe.

On the basis of the March 25, 2005 and June 27, 2005 chart notes from Ms. Harlan, the ALJ found that Ms. Reaves's mood was "usually up," that she was sleeping well, and had a good appetite, and that her headaches were not severe. Tr. 459.

The ALJ concluded that Ms. Reaves was severely impaired by post concussion syndrome, tinnitus, adjustment disorder with mixed anxiety and depressed mood, polysubstance abuse, and personality disorder. Tr. 26, 32. He found that her mental impairments resulted in mild restriction of activities of daily living: she functioned independently, gardened, and did household tasks. Tr. 27. The ALJ

accepted the conclusion of Dr. Bates-Smith in July 2003 that Ms. Reaves had "moderate difficulties in maintaining social functioning" and had exhibited emotional lability, with medication she was calmer and less agitated. The ALJ further accepted the conclusion of Dr. Bates-Smith that Ms. Reaves had moderate difficulties in maintaining concentration, persistence or pace. Id. The ALJ accepted the observation of Dr. Pearson that cognitive testing had revealed no consistent memory disturbance or significant problems with tasks requiring sustained attention and concentration. Id.

        The ALJ found Ms. Reaves's reports of headaches 3-4 times a week, with pain at a "7" on a scale of 1-10 not entirely credible because Ms. Reaves did not take any prescription pain medications, relying instead of Advil or Tylenol for headaches, continued to drive, and engaged in daily activities including cleaning the house, cooking, vacuuming, caring for hundreds of plants and using plant reference books, using a power saw occasionally and an electric dremel tool with a cutting blade, and assisting a neighbor with gardening advice and crafts instruction. Tr. 27-28. The ALJ rejected Ms. Reaves's allegation of memory, attention and concentration deficits because no such deficits were revealed by psychological testing. Id. The ALJ found Ms. Reaves's reports of headaches inconsistent with the June 27, 2005 chart note stating that Ms. Reaves reported headaches but "nothing that is severe." Tr. 28.

        The ALJ rejected Ms. Reaves's allegation that the tinnitus in

her left ear caused her to lose focus, on the ground that Dr. Pearson had noted that despite Ms. Reaves's complaints, during cognitive testing lasting two or more hours, there were no complaints of tinnitus and no indication of interference with the testing. Tr. 28. The ALJ also noted that Ms. Kelly testified that Ms. Reaves had never complained to her of ear problems. Tr. 29.

The ALJ found Ms. Reaves's allegations that she engages in few activities because of debilitating pain and mental limitations inconsistent with the May 13, 2003 report of Aniella Carlson, Ms. Reaves's friend, that Ms. Reaves cared for five dogs and two chickens, did yard work and gardening for one to two hours a day, played cards for two to three hours once a week, and fished for three to four hours once a month. Tr. 28, citing tr. 105-116.

The ALJ believed Ms. Reaves's credibility was further undermined by her poor work history, noting that she "worked minimally" prior to her motor vehicle accident, owed over $7,000 in back child support, and was a methamphetamine user and alcoholic before the accident, all disincentives to work. Tr. 29. The ALJ noted that Ms. Reaves admitted continuing to use alcohol and marijuana. Id.

The ALJ rejected Ms. Kelly's testimony that Ms. Reaves had to "relearn" everything she once knew because Ms. Kelly's testimony that Ms. Reaves was able to care for and research hundreds of plants, use a circular saw to make wind chimes, and assist her neighbor with crafts was "not consistent with allegations of confusion over the simplest of tasks." Tr. 27-28.

FINDINGS AND RECOMMENDATION Page 19

The ALJ rejected Dr. Robinson's 2003 opinion that Ms. Reaves was disabled by severe headaches and memory impairment as inconsistent with later evidence that Ms. Reaves did not require prescription medication for headaches and had reported to her current physician that her headaches were not severe. Tr. 29. The ALJ also rejected Dr. Robinson's opinions because cognitive testing had revealed no memory impairment. Id.

The ALJ also rejected the finding of Dr. Dempsey in January 2004 scoring Ms. Reaves's Global Assessment of Functioning (GAF) at 45, on the ground that Dr. Dempsey's opinions were based on Ms. Reaves's subjective complaints. Tr. 29. The ALJ found Dr. Dempsey's report inconsistent with psychological testing which showed no memory impairment and no difficulty sustaining attention or concentration. Id.

The ALJ gave significant weight to Dr. Pearson's opinions that Ms. Reaves's cognitive deficits did not suggest that she would be unable to function in the competitive job market, and his observation that despite Ms. Reaves's complaints, emotional lability was almost completely absent during the two hours of formal testing when her attention was "focused away from herself onto external, less emotionally laden problems." Tr. 29. The ALJ relied on the opinion of Dr. Pearson to find that Ms. Reaves was capable of maintaining adequate emotional control to perform simple, repetitive work with limited interaction with the public and co-workers. Id.

The ALJ found that Ms. Reaves had the physical residual

functional capacity to perform work that did not involve climbing ladders, ropes or scaffolds; did not involve exposure to noise and hazards; was simple and repetitive; and involved limited interaction with the public and coworkers. This residual functional capacity was consistent with the assessments of reviewing physician Johnson, reviewing psychologist Bates-Smith, Dr. Robinson's recommendation that Ms. Reaves avoid work around hazards such as machinery, and Dr. Pearson's assessment that Ms. Reaves was capable of simple, repetitive tasks with limited public interaction.

On the basis of the VE's testimony, the ALJ concluded that Ms. Reaves was unable to return to her past work as a temporary laborer, gas station attendant, or fast food worker, but that she was able to perform the three jobs identified by the VE: sandwich maker, caregiver, and electronics assembler. Tr. 30-31.

_____

## Standards

The initial burden of proving disability rests on the claimant. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities

FINDINGS AND RECOMMENDATION Page 21

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed

impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other available work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Ms. Reaves makes five assignments of error: first, that the ALJ improperly rejected her own testimony and her statements to her physicians that she was unable to stay on task for even short periods of time and remember oral instructions; second, that the ALJ improperly rejected the opinions of treating doctors Robinson and Dempsey; third, that the ALJ failed to address the materiality of Ms. Reaves's drug use; fourth, that the ALJ failed to determine whether Ms. Reaves's impairments, in combination, met or equaled a Listing in the Listing of Impairments; and fifth, that the ALJ misapplied the standards for addressing vocational limitations because he failed to include in his hypothetical to the VE Ms.

FINDINGS AND RECOMMENDATION Page 23

Reaves's memory losses and emotional lability.

1. <u>Evidence of emotional lability, limitations on concentration, persistence and memory of simple instructions</u>

Ms. Reaves challenges the ALJ's rejection of evidence from Ms. Kelly and herself that she has extreme difficulty with controlling emotional lability sufficiently to stay on task, has difficulty carrying out logical steps, and has little ability to remember oral instructions. Ms. Reaves argues that the ALJ has rejected this evidence "without explanation or misconstrued it," and urges the court to credit the evidence as true.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). However, the ALJ's findings must be supported by specific, cogent reasons. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Id</u>. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. <u>Id.</u> The evidence upon which the ALJ relies must be substantial. <u>Id.</u> at 724.

The existence of emotional disorder is not per se disabling; there must also be proof of the impairment's disabling severity if a claimant is to establish entitlement to disability benefits. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642-43 (9th Cir. 1982).

The ALJ's stated reasons for rejecting Ms. Reaves's

allegations of emotional lability and inability to concentrate or remember simple tasks—-including her activities of daily living, her own statements to doctors about improved mood, headaches that were not severe, and the efficacy of the antidepressants she was taking; and the absence of cognitive and memory deficits on psychological testing--are clear and convincing, free of error and based upon substantial evidence in the record.

    2.  <u>Opinions of Doctors Robinson and Dempsey</u>

Ms. Reaves urges the court to accept the opinions of Doctors Robinson and Dempsey, asserting that the ALJ has "accepted provider evidence as to improvement without further consideration of context." She asserts that the opinions of Doctors Robinson and Dempsey are consistent with each other and with the observations of other providers.

I find no error in the ALJ's rejection of Dr. Robinson's opinion that Ms. Reaves was unable to function in the competitive job market. As the ALJ noted, cognitive testing by Dr. Pearson revealed no pattern of memory impairment and no significant deficits on tasks requiring sustained attention and concentration. Further, Ms. Reaves reported to practitioners seen after Dr. Robinson that her headaches were not severe, and she testified that she did not take prescription medication for headache pain.

I agree that the record does not reveal any basis for Dr. Dempsey's January 2004 opinions other than Ms. Reaves's subjective complaints of chronic headaches and impaired memory, which the ALJ has found not credible and inconsistent with psychological testing.

Moreover, Ms. Reaves's reported symptoms at that time are not suggestive of disability: Ms. Reaves told Dr. Dempsey she was "beginning to be able to enjoy herself again" after the accident and "getting back into arts and crafts." She reported that smoking marijuana had made her "mellower," and happy, and caused her not to dwell on "negative things." When Ms. Reaves saw Dr. Dempsey in March 2004, she reported that the Zoloft was helpful in decreasing her depression and moodiness.

3. <u>Materiality findings on substance abuse</u>

Ms. Reaves contends that the ALJ made no materiality findings as to drug use, but nonetheless accepted the opinions of Dr. Pearson and Dr. Bates-Smith that substance addiction was an impairment. I find no error here.

As the Commissioner points out, the Act prohibits the award of disability benefits when substance addiction, including alcoholism, is a contributing factor material to the determination of disability. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1245 (9th Cir. 1998). In materiality determinations pursuant to 42 U.S.C. § 423(d)(2)(C), the claimant bears the burden of proving her alcoholism or drug addiction is <u>not</u> a contributing factor material to her disability determination. Thus, the materiality of substance abuse becomes an issue only after the claimant proves that she cannot perform any substantial gainful activity considering all of her impairments, including those caused by substance abuse. <u>Ball v. Massinari</u>, 254 F.3d 817, 820-21 (9th Cir. 2001). If a claimant's current physical or mental

limitations would remain once she stopped using drugs or alcohol, and these remaining limitations are disabling, then alcoholism or drug addiction is not material to the disability, and the claimant will be deemed disabled. Id.

In this case, there was no finding that Ms. Reaves was unable to perform any substantial gainful activity considering all of her impairments, and therefore no reason for the ALJ explicitly to consider whether, in the absence of substance abuse, Ms. Reaves would still be disabled.

    4.   Consideration of impairments in combination

Ms. Reaves contends that the ALJ failed to determine whether her impairments, in combination, meet or equal a listed impairment, because he "ignored or misconstrued evidence of Reaves's multiple impairments." Ms. Reaves has not elaborated on this argument by pointing out which impairments, in combination, meet or equal a particular listed impairment. Nor has she explained how the ALJ ignored or misconstrued evidence of her multiple impairments. I find this argument without merit.

    5.   Hypothetical question to the VE

Ms. Reaves argues that the ALJ's hypothetical to the VE was insufficient to support the Commissioner's finding that Ms. Reaves was able to do work which exists in the national economy, because the ALJ failed to include in the hypothetical the "functional consequences of Reaves's memory losses and emotional lability." Plaintiff's Brief, p. 20.

The hypothetical question posed to the VE by the ALJ must

reflect all of a disability claimant's limitations; if it fails to do so, the VE's testimony has no evidentiary value to support the Commissioner's finding that the claimant can perform jobs in national economy. Matthews v.Shalala, 10 F.3d 678 (9th Cir. 1993); Embrey v. Bowen, 849 F.2d 418 (9th Cir. 1988).

The hypothetical must, however, be based on medical assumptions supported by substantial evidence in the record that reflects each of the claimant's limitations. Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir. 2001); Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence. Osenbrock, 240 F.3d at 1165. If the claimant fails to present evidence that she suffers from certain limitations, the ALJ need not include those alleged impairments in the hypothetical question to the VE. Id. at 1164.

I find no error in the ALJ's conclusion that Ms. Reaves failed to establish the existence of memory deficits or emotional lability that precluded her from working. Therefore, the ALJ's failure to include such limitations in his hypothetical question to the VE was not error.

I recommend that the Commissioner's decision be affirmed.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 19, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

FINDINGS AND RECOMMENDATION Page 28

If objections are filed, a response to the objections is due December 3, 2007, and the review of the Findings and Recommendation will go under advisement with the District Judge on that date.

Dated this 2nd day of November, 2007.

/s/  Dennis James Hubel

Dennis James Hubel
United States Magistrate Judge